UNITED STATES DISTRICT COURT
for the
DISTRICT OF NEW HAMPSHIRE

Dante Baker,
          Plaintiff,

v.                                                          Civil No.  04-CV-___-__

Cesar Rivas, individually,                              Plaintiff Demands a Jury Trial
Carl Brown, individually,
David Gotthardt, individually,
James O'Mara, Jr.,  as Superintendent of the
          Hillsborough County Department of Corrections,
Theresa Pendleton, individually,
William Raymond, individually, and
Gerald Uber, individually,
              Defendants.

**Complaint for Damages and Declaratory Relief**

**<u>Introduction</u>.**

        Plaintiff is a former inmate of the Hillsborough County House of Corrections (hereinafter "the jail") who brings this action pursuant to 42 U.S.C. §1983 alleging defendants violated his rights under the Eighth and Fourteenth Amendments in that defendants falsely accused plaintiff of committing disciplinary violations, assaulted and beat plaintiff, unlawfully kept plaintiff in the maximum security unit of the jail, and subjected plaintiff to inhumane and otherwise illegal conditions while in the maximum security unit of the jail.  Plaintiff seeks compensatory and punitive damages, and declaratory relief.

**<u>Parties</u>.**

1.            Plaintiff Dante Baker now resides on Olive Road, Augusta, Georgia.  From

              December 18, 2001, until October 23,2002, Baker resided at the jail.  Baker was a

sentenced inmate from March 6, 2002, until his release from the jail.

2.        Defendant Cesar Rivas, was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

3.        Defendant Carl Brown was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

4.        Defendant David Gotthardt was at all relevant times a sergeant employed by the Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

5.        Defendant James O'Mara, Jr., was at all relevant times the Superintendent of the Hillsborough County Department of Corrections.  He is sued in his official capacity.

6.        Defendant Theresa Pendleton was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections as a hearings officer in cases of inmate discipline and at all relevant times acted under color of law.  She is sued in her individual capacity.

7.        Defendant William Raymond at all relevant times served as the classifications supervisor employed by the Hillsborough County Department of Corrections and at all relevant times acted under color of law.  He is sued in his individual capacity.

8.        Defendant Gerald Uber was at all relevant times a corrections officer employed by the Hillsborough County Department of Corrections and at all relevant times acted

under color of law.  He is sued in his individual capacity.

**Jurisdiction and Venue.**

9.          This court has jurisdiction pursuant to 28 U.S.C. §§1331(a) and 1343(3) because

this suit arises out of the Eighth and Fourteenth Amendments to the United States

Constitution and 42 U.S.C. §1983.

10.          Venue is proper in this district because all records relevant to this action are

located in New Hampshire, all defendants reside or work in New Hampshire, and all the

acts and omissions complained of in this case occurred in New Hampshire.

**Facts.**

**Defendant Rivas's "10-33" call.**

11.          As of July 14, 2002, plaintiff was held in the "upper tier," or second floor, of Unit

2D at the jail and thus received his "tier time," or time out of his cells, together with other

2D inmates who lived on the second floor.  Plaintiff's cell doors opened to a balcony

which overlooked the unit's common area.

12.          As of July 14, 2002, one corrections officer was assigned to Unit 2D at a time.

That officer operated the locking mechanisms for all the cell doors from a control panel

located in the unit's common area and from which the officer could see all the cell doors

arrayed in two floors on the other side of the common area.

13.          During the evening shift on July 14, 2002, the officer assigned to Unit 2D was

defendant Rivas.  Rivas unlocked the cell doors for the second tier, which tier included

plaintiff.

14.      Plaintiff and the other 2D inmates commenced the activities allowed them during tier time -- showers, weight lifting, access to the outside basketball court, and moving about the unit's common area.

15.      Inmate Richard West decided to take a shower.  West left his cell, walked down the stairs, across the common area and toward the showers, located at one end of the common area.  As he walked toward the showers, he approached Rivas to ask Rivas why he and Rivas were not getting along.  West had been at the jail only a couple of weeks during which time West and Rivas had several disagreements.

16.      After a few moments of conversation, and with no threatening nor provocative behavior by West nor any other inmate, Rivas turned his head toward his radio microphone attached near his shoulder and said into the handset "10-33," which was heard on all radios throughout the jail, and then Rivas began yelling "10-33," "lock down," or words to that effect for all the inmates in Unit 2D to hear.

17.      The phrase "10-33" is a radio code that expresses nearly the highest level of emergency.  It is the code used to tell the rest of the jail that an officer is "in need of assistance."  Only a "10-34," meaning "officer down," is more serious.  A 10-33 is most often called when a fight breaks out between inmates or when there is a medical emergency.  Upon hearing 10-33 every available officer is to rush to that unit and all inmates are to rush to their cells -- or even someone else's cell -- because the doors will be locked forthwith and inmates caught outside after a 10-33 are subject to discipline.

18.      Plaintiff was waiting in line to make a phone call at the far end of the common

area from Rivas at the time of the 10-33.  Upon hearing Rivas, plaintiff returned to his

cell, number 2294.

**Unit 2B.**

19.         Unit 2B is physically arranged the same as the jail's other units, but is

administratively divided so that it contains several categories inmates within those cells.

20.         First, Unit 2B contains cells designated the "Restricted Housing Unit," or RHU,

which holds inmates and detainees who have been found guilty of internal jail

disciplinary offenses and have been sentenced to a period of time in solitary confinement

as punishment.  RHU is commonly referred to as "the hole."

21.         Second, Unit 2B contains cells designated for maximum security inmates, a

designation not relevant to this lawsuit.

22.         Third, Unit 2B hold those inmates in "administrative segregation," commonly

referred to as "ad-seg."  The precise criteria for such inmates is not clear, but may include

those inmates who have been "lugged" to "the hole" but are awaiting a hearing on their

alleged jail offenses, and may include those inmates who, for a variety of reasons, cannot

be housed in any other unit within the jail.

23.         Given the severe restrictions placed upon "ad seg" inmates, due process requires

sufficient justification to place an inmate on "ad seg" status.

**Plaintiff is "lugged" to "the hole."**

24.         On July 14, 2002, after plaintiff and the other inmates were locked in their cells

and other officers arrived on the unit, Rivas began identifying to the other officers the

inmates who Rivas was falsely accusing of trying to take Rivas hostage and falsely

accusing of violating other jail rules.  No other officers were present on Unit 2D when

Rivas called the 10-33.

25.         Rivas knew that making these false statements to the other officers about

plaintiff's alleged misconduct would result in plaintiff's immediate removal from his cell

to Unit 2B.  In prison lingo, Rivas knew his false accusations would result in plaintiff

being "lugged" to "the hole."

26.         Indeed, it was Rivas's intent in making the false accusations to have plaintiff and

the other inmates removed from Unit 2D.

27.         The other officers, acting at least in part on Rivas's false accusations, began

removing plaintiff and the other inmates from their cells in Unit 2D to Unit 2B, they

began lugging plaintiff and the other falsely accused inmates to the hole.

28.         At the time plaintiff and the other inmates were removed from Unit 2D as

described below, none of them knew why.  No one saw any misconduct toward Rivas to

cause the 10-33, because there was none, no one saw any other reason for the 10-33 such

as a fight, and no one told plaintiff and the other inmates until days later the reason they

were being lugged.

29.         Plaintiff was the eighth person removed from his cell.  Defendants Brown and

Uber removed plaintiff.  Plaintiff kneeled against the far wall of his cell as directed, his

back to the officers, his hands above his head on the wall.  First, after plaintiff's feet were

shackled and hands were cuffed behind his back, defendant Brown pulled plaintiff's legs

backwards causing plaintiff's face to strike the cement floor.  Then, while lying face

down on the floor and with Uber holding plaintiff's leg, Brown struck plaintiff's head,

neck and back with his fist and knee.  After this beating, Brown and Uber handcuffed and

shackled plaintiff.  As plaintiff was dragged/walked to Unit 2B, Brown and Uber

continuously twisted plaintiff's wrists and arms, causing severe pain in Baker's wrists.

Brown and Uber shoved plaintiff into the cell in Unit 2B, causing plaintiff to strike his

head on the back wall of the cell.  Brown and Uber removed the handcuffs and shackles,

then had plaintiff submit to a strip search.

30.       Defendant Gotthardt, a supervisor, was present for, observed, supervised, and

encouraged and or condoned the above conduct of Brown and Uber as they assaulted and

transported plaintiff.

31.       At no time during the removal of plaintiff from his cell and being transported to

RHU did plaintiff provoke violence nor did he offer any resistance.

**"The Hole."**

32.       Plaintiff and the other "lugged" inmates were housed in Unit 2B one person per

cell.  From July 14, 2002, the evening all plaintiffs were lugged to Unit 2B, until about

the middle of September, 2002, when the 30 day RHU sentence imposed on plaintiff

expired, see below, plaintiff was subjected to inhumane and illegal conditions including,

but not limited to, the following:

A.        Plaintiff was on "3-day rotation," which means plaintiff was taken out of

his cell for one five-minute period every three days.  That five minute period

always occurred during the night, and was used only to give plaintiff a shower.

B.          During plaintiff's five minute period, plaintiff was escorted, naked and with handcuffs and shackles, to the shower.  The handcuffs and shackles were not removed during the shower, then plaintiff was returned to his cell for the next three days.

C.          Inside his cells, plaintiff had no television, no radio, no reading material of any kind, no writing material of any kind, no access to his legal papers, no soap, no toothpaste, no toothbrushes and no toilet paper.  Plaintiff literally had nothing.

D.          Plaintiff had to ask for toilet paper when needed.  In response to these requests, sometimes plaintiff would receive no toilet paper, and often he would receive an insufficient amount of toilet paper.

E.          Plaintiff had no access to the telephone.

F.          Plaintiff had no visits.

G.          Plaintiff had no access to mail, neither incoming nor outgoing.

H.          Plaintiff had no access to his attorney by phone, by mail, nor in person.

I.          The water in the Unit 2B cells for flushing toilets, for washing and for drinking can be controlled by the officers from a control panel outside each cell's door.  The water to plaintiff was turned off, requiring plaintiff to ask for water to be turned on to flush his toilet, to wash and to drink.  Often, the officers on duty would refuse to turn the water on for long periods of time, resulting in plaintiff living and eating in close proximity to his excrement, having to eat with dirty

hands, and going without water to drink.

J.      Plaintiff was strip searched several times a day, which searches required plaintiff to spread their buttocks and lift their genitals so the officer could see those areas, then plaintiff had to put his hands into his mouth so that the searching officer could look there as well.

K.      Plaintiff was not allowed access to buy items from the "canteen," an in-house convenience mart of sorts, from which inmates can supplement the food served by the jail.

33.      These illegal conditions continued for several weeks after the July 14 incidents, after which time the conditions improved slightly, so that plaintiff was allowed out of their cell for 30-40 minutes per day, was allowed limited phone and mail access, and allowed limited writing materials and documents in his cell.

34.      Throughout the time plaintiff was held in Unit 2B, many officers passed through that unit, including sergeants, lieutenants and captains.  All these employees were aware of the conditions under which plaintiff was being held.  Defendant O'Mara thus knew, or reasonably should have known, that plaintiff was being subjected to such inhumane conditions, yet did little to nothing to cure the situation.   Therefore, plaintiff alleges that it was the policy and custom of the jail, and thus of defendant O'Mara, to detain people confined to Unit 2B, including plaintiff, under such unconstitutional conditions as described above.

**The Hearing Process.**

35.         Plaintiff was not notified of the reason for being lugged from Unit 2D to Unit 2B for several days after July 14, 2002.  The notification occurred when an officer came to plaintiff's cell with a document and read to plaintiff what he was being charged with, which charges included an attempt to take an officer hostage.  Plaintiff was not given a copy of the charges then.

36.         Plaintiff received a disciplinary hearing on about July 19, 2002.  Defendant Pendleton presided at the hearing.

37.         Plaintiff was not afforded due process at the hearings.  Plaintiff was not given prior written notice of the charges against him, was not allowed to call witness at the hearing, was not provided the means to call witnesses nor to request evidence in his defense, was not given the opportunity to cross examine his accusers, and was not provided any information generated by the jail's alleged investigation.

38.         Defendant Pendleton only asked plaintiff what happened and, after hearing plaintiff's narrative as outlined above, closed the "hearing" without rendering a decision.  Plaintiff was individually notified a few weeks later, on August 8 or 9, 2002, that he was found guilty of the charges and sentenced to 30 days in RHU.

39.         Plaintiff was not given a written explanation for the guilty finding nor for the sanction imposed.

40.         Plaintiff was not given credit for the time already spent on "ad seg" status while in Unit 2B awaiting the hearing, approximately 25 days, and thus commenced serving the new 30 day sentence after the guilty finding on or about August 9.

41.     The failure to credit plaintiff with "time served," was pursuant to a jail policy for

which defendant O'Mara is responsible.

42.     After plaintiff served his 30 day RHU sentence, he remained in Unit 2B,

apparently on "ad seg" status, until his release on or about October 23, 2002, without

justification.

43.     Defendant Raymond, the classification supervisor, conducted no meaningful

clasification review of plaintiff and improperly kept plaintiff in Unit 2B until plaintiff left

the jail for the same alleged misconduct (the Rivas incident) that justified the 30

punishment.


Count I
(false accusations by Rivas - due process violation)

44.     Plaintiff incorporates paragraphs 1 though 43 as though stated here.

45.     It is a violation of plaintiff's due process rights for agents of the state to

knowingly make false accusations of misconduct that are intended to, and do, cause

immediate deprivations.

46.     Defendant Rivas violated plaintiff's due process rights by falsely accusing

plaintiff of attempting to take him hostage and of other disciplinary offenses.

47.     Defendant Rivas made these false accusations knowing that it would result in

plaintiff being immediately "lugged" to Unit 2B, knowing that plaintiff may be

physically harmed while being lugged, and knowing that plaintiff would receive severe

punishment through the jail's disciplinary process and the resulting time in "the hole."

48.     As a direct and proximate result of Rivas's false accusations, plaintiff suffered

harm which harm includes, but is not limited to, plaintiff's forcible removal from his cell and violent transportation to Unit 2B and the physical and emotional harms such conduct caused, receipt of internal disciplinary charges, guilty findings on those charges, and receipt of punishment to include substantial time in Unit 2B and the inhumane conditions experienced in Unit 2B.

Count II
(physical abuse by Brown, Uber, and Gotthardt, 8th Amendment)

49.        Plaintiff incorporates paragraphs 1 through 48 as though stated here.

50.        Plaintiff, as sentenced inmate, is protected by the Eighth Amendment from cruel and unusual punishment.

51.        As described above, defendants Brown and Uber used excessive force in removing plaintiff from his cell in Unit 2D and transporting him to Unit 2B.  There was no need for the use of force as plaintiff did not provoke force nor did he offer any resistance to the officers' demands.  Severe injuries were inflicted upon plaintiff. The use of force was applied maliciously and sadistically for the very purpose of inflicting harm. Such force amounts to constitutional violations.

52.        Defendant Gotthardt was a supervisor actually present and supervising the beatings and other excessive force inflicted upon plaintiff as specified above.  Gotthardt's acquiescence and support of such violence renders him liable as if he actually committed the unwarranted violent acts.

53.        As a direct and proximate result of the constitutional violations alleged here, plaintiff suffered actual physical harm as described above, and plaintiff suffered extreme emotional harm from the demeaning and wanton treatment he received at the hands of

and under the supervision of defendants Brown, Uber and Gotthardt.

## Count III
### (unconstitutional disciplinary proceedings against Pendleton - due process)

54.        Plaintiff incorporates paragraphs 1 through 53 as though stated here.

55.        As a sentenced inmate, plaintiff is properly subject to administrative restrictions for violating reasonable jail rules.  However, plaintiff is entitled to certain due process rights prior to imposing those restrictions.

56.        Plaintiff was not afforded the minimum constitutional due process rights required prior to plaintiff's lengthy confinement in RHU and all the deprivations that involved.

57.        Defendant Pendleton was responsible for the disciplinary process from the filing of charges through the hearing regarding plaintiff.

58.        As described above, plaintiff was not given prior written notice of the charges against him, plaintiff was denied the right to submit evidence at the hearing, was not given the opportunity to cross examine his accusers, was not provided any information generated by the jail's alleged investigation, and was not given written explanation for the guilty finding and sanction.

59.        As a direct and proximate result of the unconstitutional disciplinary process, plaintiff was confined to Unit 2B in the first place, was confined to RHU for an unreasonable length of time, and was subjected to the inhumane and punitive conditions in RHU and later on "ad seg" status as described above.

## Count IV
### (unconstitutional conditions of RHU against O'Mara as Superintendent - 8th Amendment)

60.        Plaintiff incorporates paragraphs 1 through 59 as though stated here.

61.     Plaintiff has the constitutional right under the Eighth Amendment to be free from conditions of confinement that are inhumane and overly punitive.  The conditions to which plaintiff was subjected as described above fall below any contemporary standard of civilization and decency.

62.     Defendant O'Mara, as Superintendent, was responsible for the policies and practices that resulted in the conditions to which plaintiff was subjected while in Unit 2B.

63.     Defendant O'Mara was aware of the unconstitutional conditions of confinement plaintiff experienced in RHU and on "ad-seg" status, yet allowed those conditions to continue.

64.     Defendant  O'Mara is thus liable to plaintiff for the harm plaintiff suffered while subjected to those inhumane conditions and the constitutional violations they created.

65.     As a direct and proximate result of the inhumane and punitive conditions that existed at RHU and on "ad seg" status, plaintiff suffered physical and emotional damages.

Count V
(unconstitutional classification process against Raymond - 14th Amendment)

66.     Plaintiff incorporates paragraphs 1 through 65 as though stated here.

67.     Plaintiff, a sentenced inmate, was constitutionally protected from severe and atypical conditions of confinement without sufficient cause.

68.     After plaintiff  served his 30 day sentence, he moved from RHU status to "ad seg" status, and was entitled to a review to determine whether and when he could leave Unit 2B and return to general population and the accompanying vast improvement in living conditions.

69.     The conditions of Unit 2B while on "ad-seg" status were severe and atypical.

70.      Defendant Raymond was responsible for conducting that review as supervisor of the jail's Classification Committee to ensure that the punitive aspects of such confinement did not amount to atypical and severe hardships so as to amount to an Eighth Amendment violation.

71.      Raymond either refused or knowing failed to conduct such classification boards, or conducted those boards in such a manner as to reaffirm and wrongfully extend the unconstitutional punishment inflicted on plaintiff by continued confinement in Unit 2B.

72.      It was and remains a policy of the jail not to conduct regular classification boards of those inmates on "ad seg" status, a policy of which Raymond and O'Mara were aware, upheld, and took insufficient if any steps to cure.

73.      Defendant O'Mara knew plaintiff in particular had not received adequate classification hearings, yet took insufficient if any steps to cure the problem.

74.      As a direct and proximate result of defendant Raymond's and O'Mara's actions and/or knowing inactions, plaintiff was wrongfully exposed to the punitive environment on Unit 2B for an extended and unjustified period of time.

75.      PLAINTIFF RESPECTFULLY DEMANDS A TRIAL BY JURY.

WHEREFORE, plaintiff Dante Baker respectfully requests:

a.      a declaration that the hearing process as described above violates due process;

b.      a declaration that the conditions of confinement plaintiff experienced while designated RHU and "ad seg" violated the Eighth Amendment;

c.      an award of compensatory damages against individual defendants Rivas, Brown, Gotthardt, Pendleton, Raymond and Uber in an amount subject to proof;

d.      an award of punitive damages from individual defendants Rivas, Brown,

Gotthardt, Pendleton, Raymond and Uber in an amount subject to proof;

e.          an award of compensatory damages against official defendant O'Mara in an

amount subject to proof;

f.          an award of punitive damages against official defendant O'Mara in an amount

subject to proof;

g.          An award of attorney's fees and costs pursuant to 42 U.S.C. §1988, and pre- and

post-judgment interest as allowed by law, against all defendants.

> Respectfully submitted,
> Dante Baker
> By his attorney

Date: September 14, 2004          /s/ Michael J. Sheehan
                                  Michael J. Sheehan, Esq. #6590
                                  58 Pleasant Street
                                  Concord, NH  03301
                                  (603) 225-5240
                                  msheehan@usa.net